# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BEVERLY S. COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-CV-236-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Beverly S. Coleman ("Coleman"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Coleman appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Coleman was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Coleman was 60 years old at the time of the hearing before the ALJ on September 30, 2009. (R. 29). She had a high school education. (R. 72). Coleman testified that she was disabled due to Reflex Sympathetic Dystrophy ("RSD"),[1] arthritis in her neck, low back pain,

---

[1] RSD is a "series of changes caused by the sympathetic nervous system, marked by pallor or rubor, pain, sweating, edema, or osteoporosis, following muscle sprain, bone fracture, or injury to nerves or blood vessels." Dorland's Illustrated Medical Dictionary 560 (29th ed.).

right leg pain, left knee pain, left hand pain and cramps, and migraines. (R. 30, 38-40, 42, 46-49, 74). She further testified that she had difficulty concentrating and had difficulty with anxiety and depression. (R. 42, 49, 71).

Coleman had suffered from RSD for 15 years. (R. 73). She stated that during that time, she had to work to support herself because she was single. (R. 73-74). Coleman's last employer wrote a letter dated March 2008, in which the employer noted that Coleman was unable to perform her work responsibilities without being in considerable pain. (R. 30-32). Coleman's employer said that she had made accommodations that allowed Coleman to take frequent breaks to sit down. (R. 31). Coleman testified that she was no longer able to work because her pain had increased and because she had dislocated her left kneecap approximately nine months prior to the hearing. (R. 42, 73-75).

Coleman testified that the majority of her pain was in her right foot, right leg, and lower back. (R. 43, 45). The pain in her foot radiated up her leg and into her lower back. (R. 45). She testified that the pain in her back was "tremendous." (R. 40). She additionally suffered pain in her left knee. (R. 42).

Coleman said that she had an "extremely painful" hereditary joint condition in the thumb of her left hand. (R. 47-49). She said she had difficulty using her left hand because the muscles in her thumb would spasm and cramp. (R. 48-49). The spasms reportedly occurred every three to four hours and lasted for 10 to 15 minutes. (R. 48). Coleman, however, is right-handed. (R. 47). She said that she could lift six to seven pounds without pain. (R. 46-47).

Coleman testified that she did not have the money or insurance to see a medical specialist or to pursue physical therapy. (R. 40-41, 70, 72). She testified she was unaware that community

mental health services were available to provide her assistance with her medical needs. (R. 72). Chiropractic doctor Tony Hicks, a family friend, treated Coleman for her physical impairments without charge. (R. 39, 69). Dr. Jeffrey Wright was her treating physician for her arthritis, migraines, and neck problems. (R. 39). Coleman stated she contacted Dr. Hicks when she injured her left knee. (R. 74). Dr. Hicks reportedly took x-rays of Coleman's knee and gave her a knee brace to use. (R. 76). According to Coleman, Dr. Wright subsequently prescribed her Naproxin and Lortab. (R. 76-77).

Coleman testified that she used anti-depressant medication and had sought mental health treatment approximately 14 years ago. (R. 49, 71). She said she experienced blurry vision and headaches, which might be side-effects from one of her medications. (R. 49-52). Coleman said she felt somewhat better when her doctor changed her medication. (R. 50).

Coleman testified that she was unable to stand all day because of the pain in her right foot, right leg, low back, and left knee. (R. 45). She said she was in constant pain when standing. (R. 43-44). When she stood, she used to be able to shift her weight from her right side to her left, but was no longer able to do so after she injured her left knee. (R. 75). She said that she could stand and walk for a maximum of 15 to 20 minutes at a time. (R. 43-45). As the day progressed, Coleman said she could not tolerate standing longer than five to ten minutes at a time. (R. 45). She tried to alleviate her pain by sitting for 20 to 45 minutes in a reclining position. (R. 44-45). Coleman said that it was painful for her to sit longer than 15 to 20 minutes because of pain in her right hip, lower back, right leg and right foot. (R. 45-46). She continuously moved and shifted her weight from one hip to the other to redistribute her weight. (R. 46).

Coleman testified regarding the affects of her physical limitations on her activities of daily living. (R. 52-57). She said that she was unable to concentrate because she was in pain the majority of the day. (R. 42). She seldom cooked because of the pain in her right leg and foot and lower back. (R. 52-54). She dusted only low level surfaces because her pain kept her from being able to reach. (R. 56-57). She said she had been unable to vacuum for approximately ten years because of the pain in her right foot, leg, and back. (R. 55-56). Her husband did the laundry, but she washed the delicate clothing once a week. (R. 59). She drove to weekly doctor appointments, monthly nail appointments, and when she visited with family and friends. (R. 66-68). She would use her handicap sticker to park or someone dropped her off at the door. (R. 57-58). Approximately twice per month, she made quick trips to the store to purchase a few items, but did not do extensive or lengthy grocery shopping.[2] (R. 57-58). Her husband drove her to the hearing because she felt anxious about going. (R. 58-59). She testified that she maintained a close relationship with her family, babysat her grandchildren on a monthly basis, and regularly visited family members. (R. 62-68). She said that she did not have much of a social life, but attended church services twice a month. (R. 60-61).

On May 18, 2005, Coleman presented to Tony L. Hicks, D.C. ("Dr. Hicks"), for sharp back pain. (R. 326-31). Coleman reported her back pain was aggravated by moving. (R. 327). She reported that her pain interfered with her ability to work, sleep, and with her daily routine.

---

[2] Coleman's testimony was at times inconsistent and/or contradictory. For example, Coleman initially stated she had not done any grocery shopping in 5 years. (R. 57). However, upon further probing by the ALJ, she stated that she did go to the grocery store twice a month to shop for a few items. (R. 57-58).

*Id*. She listed that she was using Neurontin (Gabapentin[3]), Trazadone[4], Lortab, Premarin,[5] and Protonix[6] medications. *Id.* Dr. Hicks' records reflect that Coleman started chiropractic treatment on May 18, 2005, and then continued her treatment approximately two to three times per month through 2008. (R. 334-38).

Coleman presented to R. Jeff Wright, D.O. ("Dr. Wright") on February 16, 2007 with complaints of pain in her right foot and leg. (R. 274). Dr. Wright's notes appear to reflect that Coleman reported she had suffered migraines subsequent to a motor vehicle accident. *Id*. Dr. Wright diagnosed Coleman with RSD in her right foot and right leg, a sleep disorder, and nasal allergies. *Id*. He prescribed Coleman Amitriptyline[7], Trazadone, and Lyrica.[8] *Id*.

On August 30, 2007, Dr. Wright continued to note diagnoses of RSD and a sleep disorder, as well as scalp psoriasis and nasal allergies. (R. 272). His appointment notes are hard to decipher, but appear to mention that Coleman complained of anxiety. *Id*. Dr. Wright renewed Coleman's prescriptions of Lyrica and Trazadone. *Id.*

On January 14, 2008, Coleman reported to Dr. Wright that the RSD in her foot was worse. (R. 271). Dr. Wright added Lortab to her prescriptions. *Id*.

On March 6, 2008, Dr. Wright completed Coleman's handicapped parking application

---

[3] Gabapentin is used to treat certain types of nerve pain. *www.pdr.net*.

[4] Trazadone is an anti-depressant medication. *www.pdr.ne.t*

[5] Premarin is a form of estrogen used for hormonal imbalances. *www.pdr.net*.

[6] Protonix is used to treat gastroesphageal reflux disease. *www.pdr.net*.

[7] Amitriptyline is used to treat depression. *www.pdr.net*.

[8] Lyrica is used for management of neuropathic pain. *www.pdr.net*.

and marked that Coleman was severely limited in her ability to walk. (R. 339).

Coleman presented to Dr. Wright on September 11, 2008 for pain in her right hip and right leg. (R. 322, 343). Dr. Wright continued to treat Coleman for RSD, chronic pain, and depression, and provided prescriptions for Trazadone, Lyrica, and Cymbalta.[9] *Id*. It was noted that Coleman had a depressed affect. *Id*. The notes also indicate Coleman saw a chiropractor 2-3 times per month for her hip. *Id*. Though hard to decipher, Dr. Wright's notes also appear to indicate Coleman had no joint swelling, no redness, and no tenderness. *Id*.

On October 10, 2008, it appears that Coleman reported to Dr. Wright that Cymbalta had given her relief and that her pain had decreased. (R. 342). He prescribed Coleman with Neurontin and refilled the Cymbalta. *Id*.

On October 27, 2008, Dr. Hicks wrote in a letter that Coleman had been his patient since May 18, 2005 for severe and sharp back pain. (R. 325). He noted that Coleman had a severely reduced range of motion and degenerative joint disease in the lumbar region of her spine. *Id.* He had treated her with conservative chiropractic treatment, but subsequently referred her for physical therapy and rehabilitation because her pain and condition had remained unstable. *Id*.

Coleman's amended alleged onset date of disability was March 28, 2009. (R. 29). On July 16, 2009, Coleman presented to Dr. Wright for renewal of her prescriptions. (R. 356). It was noted that Cymbalta provided Coleman with "some relief." *Id*. Coleman was using Lortab twice daily for pain. *Id*. Dr. Wright continued to diagnose Coleman with RSD. *Id.* Dr. Wright's notes indicate that Coleman's right leg and foot had no discoloration, was hypersensitive to

---

[9] Cymbalta is an anti-depressant that may also be used for managing neuropathic and musculoskeletal pain. *www.pdr.net*.

touch, and had a good pulse.  *Id*.  Also on that date, Dr. Wright completed a one-page form titled "Medical Source Opinion of Residual Functional Capacity."  (R. 351).  He checked spaces indicating that Coleman could stand and walk infrequently, defined as less than 2 hours in an 8-hour work day.  *Id*.  He also marked that she was frequently able to lift and carry less that 10 pounds.  *Id*.  He cited to Coleman's chronic RSD in her right leg and foot as the medical findings that supported his assessment.  *Id*.

On July 29, 2009, Dr. Hicks wrote in a letter that Coleman had been his patient since May 2005 for "back pain, fatigue, and pins and needles in her legs."  (R. 352).  He reiterated that Coleman had decreased range of motion in her cervical and lumbar regions.  *Id*.  He wrote that Coleman's x-rays revealed she had thoracic through lumbar scoliosis, a 15 degree curve from T5 through T12, and a 30 degree curve from T12 through L5.  *Id.*  He wrote that Coleman had anterior weight bearing in lumbar, head forward posture, and pain in her pelvis.  *Id.*  Dr. Hicks stated that Coleman's pain and condition remained unstable and continued to worsen.  *Id.*  He stated that on October 13, 2008, he had treated Coleman for severe left knee pain due to medial meniscus compression.  *Id*.  Coleman was treated with chiropractic therapy and electrical stimulation.  *Id.*  He stated that her knee condition also continued to worsen.  *Id.*  Dr. Hicks wrote that Coleman had reached a level of 75% disability and that she was unable to perform her activities of daily living.  *Id*.  He noted that Coleman was unable to stand or sit for prolonged periods.  *Id*.  In summary, he wrote that Coleman was in constant pain and that she was not progressing with standard care.  *Id.*

Dr. Wright examined Coleman on August 29, 2009.  (R. 354-55).  Coleman reported that she had a lot of stress and was getting married.  (R. 354).  He continued to diagnose Coleman

with RSD and Depression. *Id*.

On September 17, 2009, Dr. Wright noted that Coleman had experienced symptoms of swelling and autonomic instability with her RSD. (R. 357). He marked that Coleman's condition limited her ability to perform simple routine tasks because pain and weakness limited "her ability to perform strenuous tasks." *Id*.

Agency consultant Seth Nodine, M.D., conducted an examination of Coleman on May 6, 2008. (R. 282-88). Dr. Nodine reported that Coleman said that she had chronic pain in her right foot. (R. 282). She said that her pain had worsened over time and that it had become more severe in the last four years. *Id.* Coleman reported that she had undergone seven surgeries on her right foot due to pain and neuroma. *Id*. Coleman's pain persisted after the surgeries and she was subsequently diagnosed with RSD. *Id*. She reported that the pain increased after she stood and walked for a few seconds. *Id*. Coleman told Dr. Nodine that her pain varied in intensity from a burning feeling to being aching, sharp, stabbing, and throbbing. *Id*. Coleman said her pain was worse in cold weather. *Id*. She wore prescription shoes with a special insert. *Id*. She had tried diabetic shoes without any success. *Id*. Pain medication and warm water helped relieve Coleman's pain to some extent, but she reported that she was never completely free of pain. *Id*. Coleman's listed medications were Lyrica, Lortab, Trazadone, and Nexium. *Id.*

On physical examination, Dr. Nodine found that Coleman had pain with deep palpation in the sole of her right foot from midfoot to her toes. (R. 283). She experienced pain walking barefoot and she was unable to take steps on her right tiptoes. *Id*. Coleman demonstrated weak heel and toe walking on the right side. (R. 288). She had negative straight leg raises in the sitting and supine positions. (R. 284, 288). Coleman had a full range of motion in her back and

all of her joints. (R. 287-88). Dr. Nodine observed that Coleman walked at a normal and steady gait. (R. 284). Coleman's grip strength was 5/5 bilaterally. *Id*. He found normal range of motion in Coleman hand/wrists. (R. 287). Dr. Nodine assessed Coleman with right foot pain, recurrent Morton's Neuroma, RSD pain syndrome, and insomnia secondary to pain (R. 284).

Agency consultant, Denise LaGrand, Psy. D., conducted Coleman's psychological examination on July 14, 2008. (R. 291-97). During the interview, Coleman told Dr. LaGrand that she had multiple surgeries on her foot in the 1990's that caused permanent nerve damage in her foot. (R. 291). She said that she suffered chronic pain in her foot with radiation of pain up her leg and into to her hip. *Id*. She said that she had difficulty walking, standing, sitting, and concentrating. *Id*. Coleman reported that she was very emotional and tearful from being in chronic pain. *Id*. She said that she was typically depressed. (R. 293). Coleman reported that she had problems sleeping, had low energy, had a poor appetite, and had feelings of helplessness, hopelessness, and low self-esteem. (R. 294). She additionally reported that she had lost interest in the activities she had previously enjoyed, and had mild impairments with her social relationships. *Id.* She said that she had difficulty doing her household chores. *Id.* Coleman reported it was painful for her to stand to cook and shop. *Id.*

As part of her examination, Dr. LaGrand administered the Wechsler Adult Intelligence Scale - Third Edition. (R. 291-97). Dr. LaGrand found that her Coleman had an average IQ based on her performance on the test. (R. 295). She concluded that Coleman's response in a work setting was in the low average range. *Id*. She found Coleman's judgement was adequate. *Id*. Dr. LaGrand said that Coleman's mental and physical symptoms combined led to greater impairment and made it less likely that Coleman would be successful in a job setting. *Id.* In the

report, Dr. LaGrand added that:

> [T]he extent to which [Coleman's] physical problems limit her ability to function are beyond the scope of this evaluation. From a psychological standpoint, based on her reported symptoms, history, and performance on this exam, her ability to perform adequately in most job situations, handle the stress of a work setting and deal with supervisors or co-workers is estimated to be low average, with any impairment due primarily to pain."

*Id.*

On July 24, 2008, nonexamining agency consultant Janice B. Smith, Ph.D., completed a Psychiatric Review Technique form. (R. 298-311). She indicated that Coleman's mental impairments were not severe. (R. 298). Dr. Smith marked that Coleman had an affective disorder and had major depressive disorder, moderate. (R. 298, 301). Dr. Smith also marked that Coleman had a somatoform disorder, classified as a pain disorder due to her general medical condition. (R. 298, 304). For the "Paragraph B Criteria,"[10] Dr. Smith found mild restriction of Coleman's activities of daily living and mild difficulties in maintaining social functioning. (R. 308). She determined that Coleman had mild difficulty in maintaining concentration, persistence, or pace, and had no episodes of decompensation. *Id.* In the "Consultant's Notes" portion of her report, Dr. Smith summarized Dr. LaGrand's report. (R. 310). She noted that Coleman's medications for pain and insomnia could account for some of the symptoms that Coleman had reported. *Id.*

---

[10] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

A Physical Residual Functional Capacity Assessment was completed by nonexamining agency consultant J. Marks-Snelling, D.O., M.P.H., on July 25, 2008. (R. 312-19). For Coleman's exertional limitations, Dr. Marks-Snelling indicated that Coleman could lift and carry 50 pounds occasionally and 25 pounds frequently. (R. 313). It was also noted that Coleman could stand or walk for 6 hours and sit for 6 hours in an 8-hour workday. *Id.* In the portion of the form calling for narrative explanation of these findings, Dr. Marks-Snelling wrote "the claimant's pain and impairments support this RFC." (R. 31).

## Procedural History

Coleman filed an application on March 13, 2008, seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*. (R. 138-45). In her original application, Coleman alleged disability beginning December 26, 2007. *Id.* The application was denied initially and on reconsideration. (R. 88-89, 94-101). A hearing before ALJ Jeffrey S. Wolfe was held September 30, 2009 in Tulsa, Oklahoma. (R. 27-86). At the hearing, Coleman amended the alleged onset of her disability as March 28, 2009. (R. 29). By decision dated January 27, 2010, the ALJ found that Coleman was not disabled. (R. 9-22). On March 11, 2011, the Appeals Council denied review of the ALJ's findings. (R. 2-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[11] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the

---

[11] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520©. If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id. (quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Coleman met the insured status requirements through December 31, 2009. (R. 14). At Step One, the ALJ found that Coleman had not engaged in substantial gainful activity since her amended alleged onset date of March 28, 2009. *Id*. At Step Two, the ALJ found Coleman's RSD, status-post multiple surgeries on the right foot, and insomnia secondary to pain were severe impairments. *Id.* At Step Three, the ALJ found that Coleman's impairments, or combination of impairments, did not meet any Listing. (R. 16-17).

After reviewing the record, the ALJ determined Coleman had the RFC to perform a full range of medium work. (R. 17). At Step Four, the ALJ found that Coleman was capable of performing her past relevant work as a retail sales clerk and as a customer service clerk. (R. 21). Therefore, the ALJ found that Coleman was not disabled from March 28, 2009 through the date of his decision. (R. 22).

## Review

Coleman raises only one issue on appeal.[12] Coleman asserts that the ALJ's decision should be reversed for failing to properly analyze the opinion of her treating physician and her

---

[12] Although Coleman lists two separate issues: 1) failing to give proper weight to her treating physician and 2) failing to incorporate limitations found by Coleman's treating physician, the second issue is encompassed by the first, whether it was error for the ALJ to give little weight to the treating physician's opinion.

treating chiropractor.[13] A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215; *see also* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Sections 404.1527(d) and 416.927(d). *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*,

---

[13] Coleman cites to very little legal authority supporting her argument that the ALJ committed reversible error by not giving controlling weight to the opinions of Dr. Wright or Dr. Hicks. In six pages of argument, Coleman merely sets out a brief introductory paragraph of authority regarding weight given to treating source evidence. Plaintiff's Opening Brief, Dkt. #21, p. 5-10. Throughout the remainder of her brief, there were multiple statements of error, without any citation to supportive authority and without any explanation of how the brief introductory authority might apply to those arguments or to the facts of this particular case. As the Tenth Circuit has noted, "[a] party's failure to cite any authority 'suggests either that there is no authority to sustain its position or that it expects the court to do its research.'" *Flores v. Astrue*, 246 Fed. Appx. 540, 543 (10th Cir. 2007) (unpublished) (*quoting Rapid Transit Lines, Inc. v. Wichita Developers, Inc*., 435 F.2d 850, 852 (10th Cir. 1970)). Given the lack of specific arguments tied to legal authority accompanied by explanation of how that case law or the cited regulations showed error to the specific facts of this case, the Court could have found that Coleman's arguments were "perfunctory" and had been waived. *See Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009) ("perfunctory" arguments deprived the district court of the opportunity to analyze and rule on an issue). The Court ultimately decided that the issues discussed in this Order were sufficiently developed to merit consideration. The Court urges Coleman's counsel, however, in future briefing to more fully develop the arguments with analysis, reasoning, and discussion of regulations and case law, tying such discussion to the facts of the case, so that those arguments will not be susceptible to a finding that they are perfunctory.

365 F.3d at 1215 (quotation omitted).

Coleman states that the ALJ failed to properly incorporate the limitations identified by Dr. Wright into Coleman's RFC, including limitations of infrequent standing/walking and lifting/carrying no more than 10 pounds. (*See* R. 351). In the present case, the ALJ summarized the opinion evidence of Dr. Wright and stated that he "decline[d] to accept the opinion as offered" and found it was not controlling. (R. 19-20). The undersigned finds that the ALJ gave adequate specific legitimate reasons for rejecting or discounting this treating physician evidence. *See White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2001) (Tenth Circuit would not reweigh evidence when the ALJ's discounting of treating physician's opinion was based on legitimate factors such as lack of objective medical evidence supporting treating physician's opinion, inconsistencies in the treating physician's records, and the relatively brief length of the doctor-patient relationship); *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (no error where ALJ "provided good reasons in his decision for the weight he gave to the treating sources' opinions").

The ALJ discussed Dr. Wright's treating records, including Dr. Wright's assessment of Coleman's RFC. (R. 19-20). He noted that Dr. Wright on one occasion gave the opinion that Coleman could perform less-than-sedentary work activities. (R. 19). He noted a subsequent statement by Dr. Wright that Coleman was only limited in her ability to perform "strenuous" tasks and did not indicate that Coleman was limited in her routine or daily functioning. *Id.* The ALJ gave multiple reasons for giving Dr. Wright's opinions reduced weight, including: 1) that the extreme opinion that Coleman was not capable of even sedentary work was inconsistent with the objective medical evidence; 2) that Dr. Wright's opinions of Colemans's functional capacity

were inconsistent; and 3) that the majority of Dr. Wright's treating records occurred prior to the amended onset date, while Coleman was still employed, and the subsequent records did not indicate a change or deterioration in her condition since the time she was able to maintain employment. (R. 19-20). These are specific, legitimate reasons for giving a treating physician opinion reduced weight. *White*, 287 F.3d at 907 (the lack of objective evidence supporting a treating physician opinion is a legitimate basis for rejecting or discounting the opinion); *Armijo v. Astrue*, 385 Fed. Appx. 789, 794-95 (10th Cir. 2010) (unpublished) (ALJ detailed lack of supporting documentation for the degree of limitations the treating physician advanced, noted that physician's treatment notes did not support the limitations, noted that the patient's condition had not deteriorated, and "pointed to internal inconsistencies" in the treating physician opinion); *Bales v. Astrue*, 374 Fed. Appx. 780, 782-83 (10th Cir. 2010) (unpublished).

Regarding the opinion of Dr. Hicks, Coleman's chiropractor and family friend, Coleman argues the ALJ erred by failing to give it "significant or great weight." Plaintiff's Opening Brief, Dkt. #21, p. 9. The ALJ properly afforded Dr. Hicks opinion "little weight" after finding Dr. Hicks was not an acceptable medical source and his opinion was not supported by x-ray reports or other objective medical evidence. (R. 21). Pursuant to 20 C.F.R. § 404.1513(a), a chiropractic doctor is not an "acceptable medical source.*" Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000) (chiropractic reports are "not entitled to the same significant weight" as physicians' reports). Instead, a chiropractor is considered an "other source" whose opinion may be used to show the severity of a claimant's impairment and how it affects a claimant's ability to work. 20 C.F.R. § 404.1513(d); *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007).

Dr. Hicks treated Coleman for back pain and for an injury to her left knee. (R. 325-31,

334-38, 352). There are no medical records indicating Dr. Wright, or any other physician, ever treated Coleman for these alleged impairments. The existence of a medically determinable impairment can *only* be established by evidence from acceptable medical sources. *Frantz*, 509 F.3d at 1301; SSR 06-03P, 2006 WL 2329939, *2 (*citing* 20 C.F.R. §§ 404.1513(a) and 416.913(a)). Because there is no evidence from an acceptable medical source concerning Coleman's back pain and left knee injury, those impairments are not medically determinable. *Id.* Also as pointed out by the ALJ, there was no objective evidence of x-rays or x-ray reports in the record supporting Dr. Hicks' statements. There is no medical history from an acceptable medical source anywhere in the record consistent with Coleman's complaints of back or knee pain. Indeed, not even in the records from Dr. Wright, Coleman's own treating physician, was there any notation that she suffered from these specific alleged impairments or pain. Given that Dr. Hicks' opinion evidence was "other source" evidence, rather than treating physician evidence, did not describe the severity of any medically determinable impairment, and was inconsistent with other medical records, the ALJ's brief discussion and reason for giving the evidence little weight was sufficient. Accordingly, the undersigned finds no error in the ALJ's weighing of Dr. Hicks' opinion.

Finally, the Court finds that the ALJ properly weighed and discussed the medical opinions in the record. The ALJ stated he gave "considerable weight" to the assessment completed by Dr. Marks-Snelling and "significant weight" to the opinion of Dr. Nodine. (R. 21). The ALJ also discussed the medical evidence in the record and fully discussed Coleman's credibility. Coleman cites nothing in her medical records that is inconsistent with the ALJ's RFC finding and the Court finds none. The ALJ's RFC determination was supported by substantial

evidence, including the examination and opinion evidence of Dr. Nodine (R. 282-88) and the opinion evidence of nonexamining consultant Dr. Marks-Snelling (R. 312-19). *Cowan v. Astrue*, 552 F.3d 1182, 1189-90 (10th Cir. 2008) (opinion evidence of nonexamining consultants can constitute substantial evidence); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (ALJ entitled to consider nonexamining physician's opinion); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished) (nonexamining opinion was substantial evidence supporting RFC determination). Because the ALJ's decision was based on substantial evidence, and it complied with legal standards, the decision is affirmed.

**Conclusion**

Based upon the foregoing, the Court **AFFIRMS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 30th day of May, 2012.

_____
Paul J. Cleary
United States Magistrate Judge